UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>               Plaintiff,<br><br>    v.<br><br>DEVAUGHN DORSEY,<br><br>               Defendant. | NO. CR08-245RSL<br><br>ORDER DENYING DEFENDANT'S MOTION FOR A NEW TRIAL AND DENYING DEFENDANT'S MOTIONS FOR EVIDENTIARY HEARING |

**I. INTRODUCTION**

This matter is before the Court on Defendant Devaughn Dorsey's Motion for a New Trial, Motion for Evidentiary Hearing, and Amended Motion for Evidentiary Hearing[1]. Dkts. #520, #575, and #582. Dorsey bases his Motion for a New Trial on two grounds. He first presents what he purports to be newly discovered evidence which demonstrates the government knowingly used false testimony at his trial. Dkt. #520 at 5–15, 18–22. He then contends the government failed to disclose evidence favorable to his defense in violation of *Brady v.*

---
[1] Dorsey's Amended Motion for Evidentiary Hearing relies, in part, on the arguments set forth in his Motion for Evidentiary Hearing. *See* Dkt. #582 at 2 n.1. The Court thus considered both motions.

*Maryland. Id.* at 8–10. After full consideration of the record, and for the reasons set forth below, the Court DENIES Dorsey's motion for a new trial and his motions for an evidentiary hearing.

## II. BACKGROUND

The Court adopts the following facts section from the Ninth Circuit's opinion in *United States v. Dorsey*, 677 F.3d 944, 948–51 (9th Cir. 2012):

"

### A.

Between July of 2007 and May of 2008, Dorsey led a conspiracy to traffic in stolen motor vehicles. To steal motor vehicles, Dorsey and his co-conspirators did "key switches" at auto dealerships. Members of the conspiracy would ask an auto salesperson to start a vehicle. One person would distract the salesperson while another would switch the key in the vehicle with a key from a similar vehicle. The members would later return to the dealership and use the real key to drive the vehicle off the lot. After stealing vehicles, Dorsey and his co-conspirators removed their vehicle identification numbers ("VIN") and replaced them with other VINs gained from wrecking yards. They then registered the stolen vehicles with the Washington Department of Licensing using fraudulent documents, and finally either sold for profit or abandoned the vehicles.

As part of this conspiracy, Dorsey enlisted Martine Fullard to help falsely register a stolen Buick LaCrosse. At Dorsey's direction, Fullard registered the LaCrosse in her name at the Department of Motor Vehicles. Dorsey gave Fullard about $200 and told her the car would be registered in her name no longer than two weeks. Fullard saw the LaCrosse only once.

In January of 2008, Seattle police began an investigation of the vehicle-trafficking conspiracy. Dorsey learned of the investigation, and sometime after Fullard registered the LaCrosse in her name, Dorsey called Fullard and told her that the police would probably contact her. The police in fact interviewed Fullard in March of 2008. On May 7, 2008, Fullard was served with a grand jury subpoena in connection with the vehicle-trafficking investigation. She was scheduled to appear before the grand jury on May 15, 2008.

Dorsey knew that Fullard had been served with a grand jury subpoena. A few days before Fullard's scheduled grand jury appearance, Dorsey told William Fomby that Fullard was going to testify before the grand jury and said, "Man, I got to do something, man. I'm about to go back to Cali." Dorsey had previously been convicted of conspiracy to traffic in stolen motor vehicles and operating a chop shop and had served his sentence at a federal prison in California. Dorsey also told Diamond Gradney that Fullard and Tia Lovelace had received subpoenas

and accused Gradney of being subpoenaed and not telling him. And, presumably referring to Fullard, Dorsey said to Shawn Turner, "That bitch better not testify against me."

On the night of May 13, 2008, two days before Fullard's scheduled grand jury appearance, Fullard was cooking in the kitchen of her West Seattle apartment. At about 10:29 pm, seven shots were fired into the apartment through a window over the kitchen sink. Fullard's boyfriend, mother, and two children, then ages eight and ten, were also in the apartment. Three bullets struck Fullard and one struck her older son. Then two more shots were fired through a different window near the front door; they did not strike anyone. The gunshot wounds of Fullard and her son were not fatal.

Minutes after the shooting, between 10:33 pm and 10:42 pm, Dorsey made eight calls to police detectives from his cell phone. Detective Thomas Mooney received the first of Dorsey's calls to him that night just after he got the dispatch about the shooting at Fullard's apartment, at 10:29 pm. Mooney answered, and Dorsey told him that he was "at 23rd and Union" in Seattle and had found a man that Mooney was looking for. Mooney said that he had to go investigate a shooting and hung up. Then Dorsey called back and repeated that he was at 23rd and Union.

But here is the problem with Dorsey's alibi: Dorsey was not at 23rd and Union in the minutes after 10:29 pm on May 13, 2008. There is a dominant cellular tower at 23rd and Union, and Dorsey's cell phone call was not transmitted through that tower that night. Rather, between 9:16 pm and the time of the shooting, Dorsey's cell phone hit off of a cellular tower almost directly behind Fullard's apartment eight times and hit off of no other cellular tower during that period. Dorsey made no calls from his cell phone between 10:07 pm and 10:29 pm. At 10:33 pm, four or five minutes after the shooting and the time at which Dorsey called Mooney, Dorsey's cell phone hit off of a cellular tower near the east end of the West Seattle Bridge, far from 23rd and Union and only a few minutes' driving distance from Fullard's apartment.

## B

The government filed a fourteen-count indictment against Dorsey and other participants in the vehicle-trafficking conspiracy. The government then filed a twenty-count superseding indictment and a twenty-two-count second superseding indictment against Dorsey. The second superseding indictment charged Dorsey with one count of conspiracy to traffic in motor vehicles or motor vehicle parts in violation of 18 U.S.C. § 371 (Count 1); two counts of operating a chop shop in violation of 18 U.S.C. § 2322(a)(1) and (b) (Counts 2 and 3); seventeen counts of trafficking in motor vehicles in violation of 18 U.S.C. § 2321(a) (Counts 4 through 20); one count of witness tampering in violation of 18 U.S.C. § 1512(a)(1)(A), (1)(C), (2)(A) and (2)(C) (Count 21); and one count of discharging a firearm during and in relation to a crime of violence in violation of 18 U.S.C. §

924(c)(1)(A) (Count 22). Counts 21 and 22 were based on the government's allegation that Dorsey shot into Fullard's apartment to prevent her grand jury testimony.

Dorsey pleaded guilty to Counts 1 through 20, accepting his criminal liability for the charges of conspiracy, vehicle-trafficking, and operating a chop shop. But while agreeing to these serious offenses, Dorsey maintained his innocence on the counts relating to the shooting of planned grand jury witness Fullard. The case proceeded to trial on Counts 21 and 22.

Before trial, the government moved in limine to admit testimony from William Fomby, a co-conspirator who had pleaded guilty, that before the shooting he had seen Dorsey with a Glock firearm. After the pretrial motions hearing but before opening statements at trial, Mouy Harper, an ex-girlfriend of Dorsey's, told the prosecution that she, too, had seen Dorsey with a gun before the shooting. The district court ruled that Fomby's testimony and Harper's testimony were admissible. The district court also ruled that the government's exhibit of a three-gun montage, from which Harper had identified a Glock as the gun that she had seen Dorsey possessing, was admissible.

Dorsey at trial stressed the lack of direct evidence against him. There were no eyewitnesses, no gun, no fingerprints, and no DNA linking him to the shooting. Dorsey contended that of several possible theories for the shooting, the police pursued only the theory that he was the shooter. But the government presented circumstantial evidence showing that Dorsey had definite knowledge of Fullard's receipt of a grand jury subpoena and a strong motive to prevent her grand jury testimony. The government also presented Dorsey's cell phone records and cellular tower data to show Dorsey's attempts to call the police to establish that he was someplace he was not at the time of the shooting. Technology was fatal to Dorsey's alibi because he used a cell phone that showed his proximity to the scene of the shooting, not to where he said he was when he called. That Dorsey tried to create a fake alibi was not merely ineffective, but also stands high in the hierarchy of evidence tending to show guilt.

In addition, Fomby testified that before the shooting he saw Dorsey retrieve a black, bulky gun that he thought was a Glock from the trunk of Harper's car. Harper testified that she recalled Dorsey taking something from the trunk of her car, that she once saw Dorsey with a charcoal gray gun, and that she had identified the first gun in the three-gun montage shown to her by the police—a Glock .40 caliber with a black polymer frame—as a gun that looked like the gun she saw. A firearm and toolmark examiner testified that the combined characteristics of the cartridge cases and bullets recovered from Fullard's apartment were consistent with a Glock or similar type of firearm.

. . .

> After an eight-day trial, the jury found Dorsey guilty on both counts. Dorsey moved for a new trial based on the admission of the testimony of Fomby and Harper that Dorsey possessed a gun before the shooting, and on Detective Suguro's comment that Dorsey "did it." The district court denied the motion. The district court sentenced Dorsey to forty-eight years in prison: five years on Count 1, thirteen years each on Counts 2 and 3, ten years each on Counts 4 through 20, and thirty years on Count 21, all to run concurrent; and eighteen years on Count 22, to run consecutive to Counts 1 through 21."

On appeal, the Ninth Circuit affirmed Dorsey's conviction and sentence. *Dorsey*, 677 F.3d at 948. Dorsey once again moves this Court for a new trial. The Court addresses each of his arguments in turn.

### III. LEGAL STANDARDS

Rule 33 of the Federal Rules of Criminal Procedure allows a defendant to move for a new trial within three years of conviction, as long as his motion is based on the discovery of new evidence. FED. R. CRIM. P. 33(b)(1). A defendant must generally satisfy the following five-part test when his Rule 33 motion is based on newly discovered evidence: (1) He must demonstrate the evidence is newly discovered; (2) He must demonstrate that failure to discover the evidence sooner does not result from a lack of due diligence on his part; (3) He must demonstrate the evidence is material to the issues at trial; (4) He must demonstrate the evidence is not merely cumulative or impeaching; and (5) He must demonstrate that the newly discovered evidence is such that, at a new trial, the evidence would probably produce an acquittal. *E.g.*, *United States v. Kulczyk*, 931 F.2d 542, 548 (9th Cir. 1991); *United States v. Krasny*, 607 F.2d 840, 842–43 (9th Cir. 1979). The applicable legal standard differs when a defendant's motion implicates governmental misconduct. *United States v. Walgren*, 885 F.2d 1417, 1428 (9th Cir. 1989); *also United States v. Young*, 17 F.3d 1201, 1203–04 (9th Cir. 1994) (quoting *United States v. Agurs*, 427 U.S. 97, 103(1976)); *United States v. Endicott*, 869 F.2d 452, 455 (9th Cir. 1989).

One of two standards applies when a defendant's Rule 33 motion is based on newly discovered evidence which purportedly demonstrates the prosecution used perjured testimony at trial. *E.g.*, *United States v. Sanchez*, 266 Fed. Appx. 579, 581–82 (9th Cir. 2008); *Endicott*, 869 F.2d at 455; *United States v. Zuno-Arce*, 25 F.Supp.2d 1087, 1115–17 (C.D. Cal. 1998). If newly discovered evidence demonstrates the prosecution knew, or should have known, a witness's testimony was perjured, the defendant's conviction "must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Agurs*, 427 U.S. at 103; *Walgren*, 885 F.2d at 1427. However, if the defendant cannot demonstrate the government knew about the false testimony, the Ninth Circuit appears to apply one of two standards. In some instances, the Ninth Circuit has stated that if a defendant cannot demonstrate the government knowingly used false testimony, the defendant must satisfy the five-part test generally applied to Rule 33 motions premised on the discovery of new evidence. *Krasny*, 607 F.2d at 844–45 ("We are thus in agreement with *Stofsky* that the probability standard is appropriate for determining whether perjury requires a new trial . . . at least when the government did not knowingly or negligently use the perjured testimony.") (citing *United States v. Stofsky*, 527 F.2d 237, 246 (2d Cir. 1975)). However, the Ninth Circuit has also stated that if a defendant cannot establish the government knowingly used perjured testimony, a new trial may nonetheless be warranted if the defendant can demonstrate that "'there is a reasonable probability that [without the evidence] the result of the proceeding would have been different.'" *Young*, 17 F.3d at 1204 (quoting *Endicott*, 869 F.2d at 455).

A third standard applies when a defendant's motion for a new trial is based on the prosecution's alleged suppression of, or failure to disclose, evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). To establish a *Brady* violation, a defendant must demonstrate

that (1) the suppressed or undisclosed evidence is favorable to the defendant; (2) the evidence was suppressed by the prosecution; and (3) there is a reasonable probability that the trial outcome would have been different had the evidence been disclosed to the defense. *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999); *also Walgren*, 885 F.2d at 1427–28.

Rule 33 motions premised on the discovery of new evidence are viewed with great caution, and are not favored by courts in the Ninth Circuit. *U.S. v. Marcello*, 568 F. Supp. 738, 740 (C.D. Cal. 1983) (citing CHARLES ALAN WRIGHT, FEDERAL PRACTICE AND PROCEDURE: CRIMINAL § 557 (2d ed. 1982)). District court judges have broad discretion to determine that newly discovered evidence is not sufficiently credible to warrant granting a new trial. *United States v. Diggs*, 649 F.2d 731, 740 (9th Cir. 1981), *overruled on other grounds*, *United States v. McConney*, 728 F.2d 1195 (9th Cir. 1984), *as stated in United States v. Ibarra-Alcarez*, 830 F.2d 968, 973 n.1 (9th Cir. 1987). Whether an evidentiary hearing to consider a Rule 33 motion will be granted is also a matter of the court's discretion. *United States v. Thompson*, 493 F.2d 305, 310 (9th Cir. 1974).

# IV. DISCUSSION[2]

## A. The Government's Alleged Use of False Testimony

Dorsey contends newly discovered evidence demonstrates the government violated his due process rights by knowingly eliciting perjured testimony during his trial. Dkt. #520 at 23. To support this argument the Defendant presents the recantations of Muoy Harper and Shawn

---

[2] In his Reply to the government's response, Defendant, for the first time, raises two additional arguments. Dkt. #555 at 2, 11–17. Dorsey first argues that the government's reliance on cellular tower data to convict him is "flawed and unreliable." *Id*. Dorsey then argues the government did not have a search warrant to collect his cell site data, and thus his Fourth Amendment right to privacy was violated. *Id*. Because they are raised for the first time in his Reply, the Court will not address these arguments. *See, e.g.*, *Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007) ("The district court need not consider arguments raised for the first time in a reply brief."); *also United States v. Wilde*, 74 F. Supp. 3d 1092, 1099–1100 (N.D. Cal. 2014) (arguments raised for the first time in defendant's reply brief not addressed by the court). This decision by the Court renders Dorsey's motion to supplement his motion for a new trial with an intervening ruling (Dkt. #567) moot.

Turner, excerpts of Dorsey's phone records, and the sworn affidavit of Tammy Jackson. Dkt. #528, Exs. A, C, E, G. The Court addresses each piece of evidence in turn.

### i. *Muoy Harper's Recantation*

Muoy Harper's recantation does not warrant granting Dorsey a new trial, because the Court does not find her recantation credible. To successfully demonstrate the government knowingly presented false testimony by Ms. Harper, Dorsey must first establish that Ms. Harper's trial testimony was false. *See Young*, 17 F.3d at 1203 (defendant presented "competent evidence" of prosecution's knowledge of witness's false testimony); *Zuno-Arce*, 25 F. Supp. 2d at 1115–16. However, recanted witness testimony is viewed with "utmost suspicion," and courts have declined to find recanted witness testimony credible where the court has observed the credibility of a witness at trial. 3 CHARLES ALAN WRIGHT & SARAH N. WELLING, FEDERAL PRACTICE AND PROCEDURE § 585 (4th ed. 2011).

To support the allegation that the government knowingly used Ms. Harper's perjured testimony, the Defendant submits a transcript of an interview of Ms. Harper conducted by Stephen Robinson, a private investigator hired by Dorsey, and a sworn declaration and affidavit. Dkts. #520 at 5–8, #528, Ex. A, and #582, Exs. 1 and 2. At trial, Ms. Harper's testimony was used to demonstrate that Dorsey possessed the means to carry out the shooting of Ms. Fullard and her son. *See* Dkt. #458 at 164–65. The government also used Ms. Harper's testimony to establish that Dorsey called her from a phone number ending in "7743" throughout their relationship. *Id*. at 160–61.

In her recantation, Ms. Harper explains she never saw Dorsey with a gun, but that she felt pressured to change her testimony by a Washington State Patrol ("WSP") officer, Detective Donovan Daly. Dkts. #528, Ex. A, and #582, Ex. 1 at 1–2. According to Ms. Harper, Det. Daly insinuated she could go to prison if she did not testify that she had seen Dorsey with a

1  gun. Dkt. #524 at 18–22, 24–28, 34–38. Ms. Harper also explains that although she did not
2  know whether Dorsey had called her from a phone number ending in "7743," she nonetheless
3  testified Dorsey used that phone number because Det. Daly misled her to believe, by showing
4  her someone else's phone bills, that Dorsey called her using that phone number, and by once
5  again insinuating she could end up in prison if she testified otherwise. Dkt. #524 at 47–54.

6  According to the Defendant, Ms. Harper's recantation entitles him to a new trial
7  because her trial testimony was critical in helping the government corroborate the testimony of
8  William Fomby. Dkt. #520 at 5. At trial, Mr. Fomby testified he had seen Dorsey retrieve a
9  gun from Ms. Harper's home. Dkt. #458 at 34–39. The government also used cell phone
10 records for the phone number ending in "7743" to demonstrate Dorsey had called Mr. Fomby
11 before, and on the day of, Ms. Fullard's shooting. *Id*. at 42–49. Mr. Fomby testified that
12 during these phone calls the Defendant mentioned he knew of Ms. Fullard's grand jury
13 subpoena. *Id*. at 43. Mr. Fomby also testified that during this phone call Dorsey said he had
14 "to do something" about Ms. Fullard testifying against him at the May 15, 2008 grand jury
15 proceeding. *Id*. at 75. Dorsey contends that had Ms. Harper not been coerced to testify falsely
16 about seeing him with a gun, or about having received phone calls from the phone number
17 ending in "7743," the government would not have linked him to Count 22, the crime of
18 discharging a firearm in relation to a crime of violence. *See* Dkts. #520 at 5 and #555 at 6. The
19 Court strongly disagrees**.**

20 Defendant fails to demonstrate Ms. Harper's trial testimony was false for several
21 reasons. First, the Court questions the credibility of Ms. Harper's recantation because the
22 Court had an opportunity to observe her in-court testimony, and the Court does not find her
23 sworn affidavit more credible than the sworn testimony she provided at trial. Additionally, Ms.
24

Harper's trial testimony was consistent with the testimony of several other trial witnesses. Aside from Ms. Harper, Mr. Fomby also testified that he had seen Dorsey with a gun prior to Ms. Fullard's shooting. Dkt. #458 at 34–39. This testimony was further corroborated by the testimony of Det. Tyson Sagiao. Dkt. #457 at 81. Det. Sagiao testified that in March 2008, Dorsey called him and let him know that "he [Dorsey] had to arm himself to protect himself." *Id*. Regarding the phone number ending in "7743," Detective Paul Suguro and Shanelle Moody also testified that Dorsey called them using this number. Dkts. #458 at 228 and #460 at 36–43. Finally, and most notably, as this Court noted at his sentencing hearing, Defendant "[has] a history of threatening witnesses to deter their cooperation in the justice system." Dkt. #466 at 46. Given these circumstances, the Court does not find Ms. Harper's recantation credible.

Even if Dorsey could demonstrate that Ms. Harper's testimony was false, he has not demonstrated that the government knew of this alleged falsity. Even applying the more lenient legal standard of *United States v. Young*, Ms. Harper's recantation does not warrant a new trial because the government presented sufficient independent evidence of Dorsey's guilt. *See United States v. White*, 972 F.2d 16 (2d Cir. 1992) (new trial not warranted, even where trial witness admitted to perjury, where independent proof of defendant's guilt existed). At trial, the government introduced cell phone records and cellular tower data to demonstrate Dorsey was in close proximity to Ms. Fullard's home on the night she was shot. Dkt. #462 at 149–70, 190–92. Using this data, the government also demonstrated the Defendant called two detectives, minutes after Ms. Fullard was shot, in an attempt to create a false alibi. It was this evidence, as noted by the Ninth Circuit, which was particularly indicative of Dorsey's guilt. *See Dorsey*, 677 F.3d at 950 ("That Dorsey tried to create a fake alibi was not merely ineffective, but also stands high in the hierarchy of evidence tending to show guilt.").

Given the independent, circumstantial evidence presented by the government, the Defendant has not demonstrated there is a reasonable probability that had Ms. Harper's allegedly perjured testimony not been used, the trial outcome would have been different. Dorsey thus fails to convince the Court that Ms. Harper's recantation warrants granting him a new trial.

    *ii.    Shawn Turner's Recantation*

Shawn Turner's recantation also does not warrant granting Dorsey a new trial. At trial Mr. Turner testified that in May 2008 he heard the Defendant state, "that bitch better not testify against me" when speaking about two women set to testify against him. Dkt. #458 at 181–82. At trial, the prosecution presented this testimony to demonstrate Dorsey knew of Ms. Fullard's grand jury subpoena. Dkt. #533 at 4–5. Dorsey challenges the credibility of this statement by introducing a transcript of an interview between Mr. Turner and his private investigator Mr. Robinson, and a sworn affidavit by Mr. Turner. Dkts. #528, Ex. E and #582, Ex. 3. In this transcript, Mr. Turner explains he was coerced to testify falsely after a detective with the WSP, and a female prosecutor, made him believe Dorsey was accusing him, and another person, of shooting Ms. Fullard. Dkts. #520 at 13–14 and #528, Ex. E. This is supposed to have pressured Mr. Turner to perjure himself at trial (and during his grand jury testimony) by testifying that he heard Dorsey state, "that bitch better not testify against me." Dkt. #520 at 14.

Dorsey argues that Mr. Turner's recantation is important because Mr. Turner's testimony was used to corroborate the statement against interest introduced against him at trial. Dkt. #555 at 2. Because Mr. Turner has recanted his testimony, Dorsey reasons the corroborating circumstances allowing the statement against interest no longer exist, and his statement against interest should not be allowed at trial. *Id*. Dorsey also contends Mr. Turner's

recantation interview serves as further proof that Det. Daly used coercive tactics to pressure trial witnesses into giving favorable testimony for the government. Dkt. #520 at 12–15.

As with Ms. Harper's recantation, the Court declines to find Mr. Turner's "recantation interview" and affidavit more credible than his actual trial testimony. Mr. Turner's testimony, like Ms. Harper's testimony, was corroborated by several other witnesses at trial. At trial the following witnesses testified that Dorsey knew of Ms. Fullard's grand jury subpoena: Diamond Gradney, Kizzy Wright, William Fomby, and Seattle Police Department ("SPD") Det. Thomas Mooney. Dkts. #548 and #562.

Notably, even if the Court agreed that Mr. Turner's trial testimony was false, Dorsey nonetheless fails to demonstrate the government knew, or should have known, about Mr. Turner's perjured testimony. And, similar to Ms. Harper's alleged recantation, given the independent, circumstantial evidence presented against him at trial, Dorsey fails to convince the Court there is a reasonable probability that, without Mr. Turner's alleged perjury, the outcome of his trial would have been different.

       *iii.*    *Diamond Gradney's Allegedly Perjured Testimony*

The Defendant also fails to convince the Court that newly discovered evidence related to trial witness Diamond Gradney warrants granting him a new trial. Dorsey contends his phone records demonstrate the government knowingly offered Ms. Gradney's perjured testimony. Dkts. #520 at 20–23 and #528, Ex. J. Ms. Gradney became involved in Dorsey's car-theft scheme when she attempted to register a stolen car in her name. Dkt. #458 at 198–99. At trial, Ms. Gradney testified she never called Dorsey, but she received a phone call from him in March 2008. *Id*. at 197, 199. Ms. Gradney testified that during this phone call Dorsey mentioned he was aware Ms. Fullard received a subpoena. *Id*. at 200.

Dorsey attempts to undermine Ms. Gradney's trial testimony by presenting excerpts of his own phone records. Dkt. #528, Ex. J. According to Dorsey, his phone records demonstrate Ms. Gradney's trial testimony was false because the records show Ms. Gradney called Dorsey, not that he called Ms. Gradney. Dkt. #520 at 21. He also argues that given the date of his alleged phone call to Ms. Gradney, in March 2008, he could not have known about Ms. Fullard's subpoena because Ms. Fullard was not served with a subpoena until May 2008. *Id.* at 21–22. Dorsey alleges the government knew this testimony was false because it "reviewed and investigated" his and Ms. Gradney's phone records. *Id.* at 21.

The phone records submitted by Dorsey do not demonstrate the government knowingly offered Ms. Gradney's allegedly perjured testimony at trial. As an initial matter, the Court agrees with the government that Dorsey's and Ms. Gradney's phone records are not newly discovered. *See* Dkt. #533 at 12. To be newly discovered, evidence must be unknown at the time of trial. *See Cleary v. United States*, 163 F.2d 748 (9th Cir. 1947) (evidence known to defendant before trial not considered "newly discovered"). Here, the Court finds it implausible that Dorsey was unaware of his own phone records. However, even if Defendant's phone records are newly discovered, they nonetheless do not warrant granting a new trial.

Dorsey provides phone records, but he does not indicate which number allegedly belongs to Ms. Gradney and, even if he did, the Court does not agree this indicates that Ms. Gradney's trial testimony was false. *See* Dkt. #528, Ex. J. Additionally, even if the Court agreed these phone records demonstrate Ms. Gradney's testimony is false, Dorsey has not demonstrated the government had reason to believe this testimony was false. In fact, several other trial witnesses, including William Fomby, Kizzy Wright, Shawn Turner, and SPD Det.

Mooney, all testified Dorsey knew of Ms. Fullard's grand jury subpoena before she was shot. Dkt. #462 at 111–12.

Finally, and most importantly, Dorsey does not demonstrate there is a reasonable probability that without Ms. Gradney's alleged perjury the outcome of his trial would have been different. As explained above, several other trial witnesses testified that Dorsey knew of Ms. Fullard's subpoena. And, as the Ninth Circuit noted on appeal, his conviction was largely based on cell phone records and cellular tower data that placed him near Ms. Fullard's home the night she was shot and undermined his false alibi. *Dorsey*, 677 F.3d at 950. The Court thus finds Dorsey's phone records are not newly discovered evidence that warrant granting a new trial.

> *iv.* *Tammy Jackson's Affidavits*

Dorsey next presents the affidavits of Tammy Jackson as newly discovered evidence that purportedly demonstrates the prosecution knew that Mr. Fomby, one of Dorsey's co-conspirators, testified falsely at trial.[3] *See* Dkts. #520 at 18–19. At trial, Mr. Fomby testified that on the night of May 13, 2008, and the morning of May 14, 2008, he received several phone calls from the Defendant. Dkt. #458 at 42–48. Mr. Fomby also testified that Dorsey used several phone numbers, including a phone number ending in "7743," and he testified that Dorsey was aware Ms. Fullard was served with a grand jury subpoena. *Id.* at 47. In her affidavits, Ms. Jackson contends she, not Dorsey, called Mr. Fomby several times the night of May 13, 2008. *See* Dkts. #520 at 18–19, #528, Ex. G at 16–18, and #582, Ex. 6 at 1–2. Dorsey argues that because Ms. Jackson possessed the "7743" phone number, the Court should conclude Mr. Fomby testified falsely at trial. The Court disagrees.

---

[3] This is not the first time Dorsey has questioned the credibility of Mr. Fomby's testimony. Dorsey first raised similar arguments concerning Mr. Fomby in his initial Rule 33 motion. *See* Dkt. #390 at 8–11.

Dorsey's attempt to introduce Ms. Jackson's affidavits as newly discovered evidence that warrant granting a new trial is unpersuasive. Even if Dorsey could demonstrate Ms. Jackson's affidavits establish the falsity of Mr. Fomby's testimony, he fails to demonstrate the government was aware Ms. Jackson used the "7743" phone number. Any contention to the contrary is belied by one of Ms. Jackson's affidavits. *See* Dkt. #528, Ex. G. In one of her affidavits, Ms. Jackson explains that after the trial she notified Dorsey's counsel that she, not Dorsey, called Mr. Fomby on May 13, 2008 and May 14, 2008. *Id*. During this exchange, Ms. Jackson explains she told Dorsey's counsel she would have testified on Dorsey's behalf. *Id*. at 18. It is evident from Ms. Jackson's affidavit that Dorsey, not the government, knew of Ms. Jackson's use of the "7743" phone number.

Notably, even if Dorsey could demonstrate that Ms. Jackson's affidavit establishes the falsity of Mr. Fomby's trial testimony, he fails to meet either standard applied when the government unwittingly presents perjured testimony. Applying the more lenient "reasonable probability standard," he fails to show there is a "reasonable probability that [without the evidence] the result of the proceeding would have been different." *Young*, 17 F.3d at 1204. As explained by the Ninth Circuit, it was the cell phone records and cellular tower data for the phone number ending in "1901," not the number ending in "7743," which ultimately demonstrated Dorsey was near Ms. Fullard's home (and not at the location he claimed to be at to form his alibi) the night she was shot. *See Dorsey*, 677 F.3d at 950; *also* Dkt. #462 at 149–170, 190–192.

Dorsey also fails to satisfy the five-part test generally applied to Rule 33 motions based on the discovery of new evidence. First, given Ms. Jackson's disclosure to trial counsel of her use of the "7743" phone number, the Court fails to see how her affidavit testimony is "newly

discovered." However, even if Ms. Jackson's affidavits are newly discovered, Dorsey fails to demonstrate that he could not have discovered this testimony sooner. Dorsey's arguments to the contrary are not persuasive. He contends he failed to call Ms. Jackson at trial because the government allegedly failed to disclose Mr. Fomby would change his trial testimony. Dkt. #520 at 19. However, Dorsey fails to explain how Mr. Fomby's trial testimony differed from the testimony disclosed to him before trial. *See id*. The Court is equally unpersuaded by the contention that his counsel could not investigate the "7743" phone records because the government disclosed these records while trial was underway. *Id*. Dorsey personally knew that the "7743" phone number was not his, and his failure to call Ms. Jackson as a witness to rebut the government's evidence to the contrary cannot be seen as anything other than a lack of due diligence on his part.

Finally, even if the Court agreed that Ms. Jackson's testimony is newly discovered, and that Dorsey's failure to discover this evidence does not result from his failure to exercise due diligence, the Court would nonetheless find that Ms. Jackson's testimony is not such that, at a new trial, this evidence would probably produce Dorsey's acquittal. At trial, the government used call data records for the number ending in "1901," not the number ending in "7743," to demonstrate Dorsey was near Ms. Fullard's home on the night she was shot. *See* Dkt. #462 at 149–70, 190–92.

The Court thus finds that Ms. Jackson's affidavits do not warrant granting a new trial.

**B. The Government's Alleged Failure to Disclose Evidence Favorable to Defendant**

Dorsey next contends the government failed to disclose the identity of the woman in whose house Mr. Turner allegedly heard Dorsey make a statement against interest. Dkt. #520 at 8–10. According to Dorsey, the government's alleged suppression of this person's identity prevented him from adequately investigating this trial testimony. *Id*. at 9–10. At trial, Mr.

Turner testified that he heard Dorsey say, "that bitch better not testify against me," in the home of someone named "Maleah." Dkt. #458 at 182. Although Mr. Turner could not remember the name of the woman in whose home Dorsey made this statement, Mr. Turner remembered that the woman's name started with an "M," and that she was Anthony Pines, Jr.'s girlfriend. *Id*. at 185. Because Malika Wells dated Anthony Pines, Jr. in 2008, Dorsey contends she was the woman referred to by Mr. Turner. Dkt. #520 at 9–10. In her affidavits, Ms. Wells contradicts Mr. Turner's trial testimony by explaining she does not know Mr. Turner, she denies Dorsey was ever in her home, and she denies ever hosting large gatherings. *Id*.; Dkts. #528, Ex. C and #582, Ex. 5.

Dorsey fails to convince the Court that the government suppressed, or failed to disclose, Ms. Wells' identity. If the prosecution suppresses evidence material to a defendant's guilt, a defendant's due process is violated. *Brady*, 373 U.S. at 87. To succeed on a new trial motion based on a *Brady* claim, a defendant must demonstrate the prosecution suppressed, or failed to disclose, evidence. *Strickler*, 527 U.S. at 281–82. To demonstrate the prosecution knowingly withheld Ms. Wells's identity, Dorsey submits an investigation log report prepared by WSP Det. Daly. *See* Dkt. #528, Ex. B. The investigation log purportedly demonstrates that the prosecution knew Ms. Wells' identity as early as June 2, 2010. Dkts. #520 at 9–10 and #528, Ex. B. This information, without more, does not convince the Court that the prosecution suppressed, or failed to disclose, Ms. Wells's identity. While Det. Daly's investigation log report indicates the name of Mr. Pines' girlfriend was "Maleka," Dorsey does not explain when the prosecution disclosed Det. Daly's investigation log report to his counsel. *See* Dkt. #528, Ex. B. Further, while Dorsey claims the prosecution informed his counsel of Mr. Turner's

planned testimony *after* the trial started, this does not necessarily mean the investigation report log was also turned over to Dorsey's counsel after his trial was underway.

Notably, even if Dorsey demonstrates the prosecution suppressed or failed to disclose Ms. Wells's identity, he nonetheless fails the materiality requirement needed to succeed on a *Brady* claim. In *Brady* claims, evidence is material "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Strickler*, 527 U.S. at 264. A "reasonable probability" exists where the newly discovered evidence undermines confidence in a trial outcome. *Endicott*, 869 F.2d at 455 (citing *United States v. Bagley*, 473 U.S. 667, 682 (1985)). Additionally, the new evidence "must not be merely cumulative or impeaching." *Id.* at 455 (citing *Krasny*, 607 F.2d at 843). Here, Dorsey appears to argue that had Ms. Wells's identity been disclosed, he could have called her as a witness to undermine Mr. Turner's trial testimony. It is unlikely that this evidence would have undermined confidence in the jury's verdict. As the Ninth Circuit recognized, the strongest evidence against Dorsey were the cell phone records and cellular tower data that placed him near Ms. Fullard's home the night she was shot. *Dorsey*, 677 F.3d at 950. Evidence of Ms. Wells' identity, and her assertion that Dorsey and Mr. Turner could not have been in her home, would also have been cumulative given that Dorsey called Mr. Pines to undermine Mr. Turner's testimony. *See* Dkt. #459 at 183–88.

The Court thus finds that Ms. Wells's identity and affidavits are not newly discovered evidence that warrant granting a new trial.

## C. Defendant's Evidentiary Hearing Requests

Rule 33 motions are generally "'decided solely upon affidavits.'" *United States v. Kerr*, No. CR-11-02385-PHX-JAT, 2016 WL 3947102, at *8–9 (D. Ariz. July 22, 2016) (quoting *United States v. Colacurcio*, 499 F.2d 1401, 1406 n.7 (9th Cir. 1974)). However, although it is

within the Court's discretion to decide whether to grant a motion for an evidentiary hearing, evidentiary hearings should be granted "if the facts alleged, taken as true, would constitute grounds for a new trial." *Thompson*, 493 F.2d at 310; *Kerr*, 2016 WL 3947102, at *8 (citing *United States v. Scott*, 521 F.2d 1188, 1196 (9th Cir. 1975)). Dorsey asks the Court to grant him an evidentiary hearing because his motion for a new trial is partly based on Ms. Harper's and Mr. Turner's recantations. Dkt. #575 at 2–3.

The Court declines to grant Defendant's motion for an evidentiary hearing for several reasons. As explained in sections A.*i* and A.*ii*, the Court does not agree that Ms. Harper and Mr. Turner's recantations constitute grounds for a new trial. The Court's decision is also not altered by the affidavits of Ms. Jackson, Ms. Wells, Mr. Pines, or the introduction of Dorsey's phone records. As previously explained, Dorsey fails to demonstrate the evidence introduced by Ms. Jackson's affidavit, Ms. Wells' affidavit, and his phone records meet the respective legal standards needed to demonstrate this evidence warrants granting a new trial.

Dorsey's motions for an evidentiary hearing (Dkts. #575 and #582) are accordingly DENIED.

## V. CONCLUSION

Devaughn Dorsey was fairly tried and justly convicted at his trial. The Court has no doubt that the evidence established he was the person who shot Martine Fullard and her ten-year-old son in their West Seattle home. The Court, having considered Defendant's motions, the government's responses thereto, Defendant's replies, and the remainder of the record, hereby finds and ORDERS[4]:

1) Defendant's Motion for a New Trial (Dkt. #520) is DENIED;

---

[4] The Court also grants Dorsey's motion for leave to file a supplemental reply in support of his Rule 33 motion (Dkt. #558). Dorsey's supplemental reply (Dkt. #557) was considered by the Court.

2) Defendant's Motion for an Evidentiary Hearing (Dkt. #575) and Amended Motion for an Evidentiary Hearing (Dkt. #582) are DENIED;

3) The Clerk of the Court is directed to forward a copy of this Order to Defendant and all counsel of record.

DATED this 31st day of October, 2017.

*[signature: M S Lasnik]*
Robert S. Lasnik
United States District Judge

ORDER DENYING DEFENDANT'S MOTION FOR A NEW TRIAL AND DENYING DEFENDANT'S MOTIONS FOR EVIDENTIARY HEARING - 20